Filed 10/26/15  P. v. York CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>FRANK JACOB YORK et al.,<br><br>  Defendant and Appellant. | 2d Crim. No. B248730<br>(Super. Ct. No. F452204)<br>(San Luis Obispo County) |

The statements of an accomplice must be corroborated.  So must the statements of an in-custody informant.  Here we decide, among other things, that the statements of an accomplice and the statements of an informant may corroborate one another.

Frank Jacob York and Rhonda Maye Wisto appeal a judgment after conviction by jury of murder and conspiracy to commit murder.  (Pen. Code, §§ 187, subd. (a), 182, subd. (a)(1).)[1]  The jury found true kidnapping-murder and torture-murder special circumstance allegations against both York and Wisto.  The trial court sentenced both defendants to life in prison without the possibility of parole for the murder, and imposed, but stayed, sentences of 25 years to life for the conspiracy.  (§§ 654, 187, subd. (a).)

York contends the trial court should have suppressed his two interviews with police because he did not knowingly and voluntarily waive his *Miranda* rights.  (*Miranda*

---

[1] All statutory references are to the Penal Code unless otherwise stated.

*v. Arizona* (1966) 384 U.S. 436, 475.) Wisto contends the trial court should have excluded the interviews or severed her trial, because she had no opportunity to confront York. She contends York's statements implicated her, despite redaction. (*Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*).) Wisto also contends there was insufficient evidence to corroborate the testimony of accomplices and in-custody informants because those two classes cannot corroborate each other. York and Wisto contend there is no substantial evidence of independent criminal purpose to support the torture-murder findings. York contends there is no such evidence to support the kidnapping-murder special circumstances against him. We affirm.

FACTUAL AND PROCEDURAL HISTORY

On September 26, 2010, York, Ty Michael Hill, Cody Miller, and Jason Greenwell tortured, kidnapped, and murdered Dystiny Myers, a 15-year-old runaway girl. They bound and beat her in Wisto's trailer in San Luis Obispo, put her in a bag while she was still alive, and drove her to Santa Margharita where they burned her body in a pit. Myers suffocated after one of the men shoved a glove down her throat.

Wisto is York's mother. She planned the crimes with Hill. Wisto provided materials to dispose of Myers's body and acted as a lookout while the men tortured Myers.

York and Wisto were jointly tried after the other participants pled guilty to various charges. The facts are derived from their testimony and from Miller's statements to first responders, York's videotaped interviews, York's and Wisto's statements to cellmates and their correspondence from jail. The trial court instructed the jury not to consider York's interviews against Wisto.

Wisto and York lived in Wisto's trailer in San Luis Obispo. They sold drugs and engaged in other crimes. Hill, Miller, and Greenwell moved into the trailer. Myers ran away from home. Hill met her in Santa Maria and brought her to Wisto's trailer. They all used methamphetamine. Myers wanted to leave.

Myers "behaved badly" at the trailer. Wisto was upset because Myers stole makeup and compact discs from her and carved initials in a desk that belonged to Wisto's mother. Wisto thought Myers talked too much and was disrespectful.

2

One or two days before the murder, Greenwell heard Wisto and Hill talk about "disposing of a body."  Hill made a list of things they would need and Miller gave it to Wisto.

On the night of the murder, Hill said he needed something that burns "real hot [and] real fast."  Myers approached the group and said she was leaving.  She and Hill went into York's bedroom.  He injected something into her leg.  She became "out of it."

Hill told everyone to put on dark clothes.  Wisto told York what to wear.

York, Hill, Miller, and Greenwell went into York's room and beat Myers with a baseball bat.  They "hog tie[d]" her with duct tape and rope.  Hill hit Myers in the head with the bat three or four times.  He beat her with brass knuckles and the sheath of a sword.  York kicked her and stomped on her.  He confessed he hit Myers in the shins and knees with the bat after Hill told him to "Mark McGwire her legs."  Myers screamed while they beat her.

Wisto was not in the room.  While the men were beating Myers, Wisto came to the back door and warned them that someone was at the front door.

Hill put Myers into a bag and Greenwell carried her to the bed of Wisto's truck where Hill, Miller, and Greenwell loaded her into the back.  Wisto collected shovels and told Greenwell where to find scrap lumber at the back of the property.  She told everyone to empty their pockets and gave them a walkie-talkie.

York, Hill, Miller, and Greenwell drove Myers to a remote place in Santa Margharita.  They dug a pit.  York hit Miller in the head with a bat and Miller hit him with a shovel.  Miller was able to get up and run.  York chased him but could not catch him.  Hill and Greenwell put Myers's body and her belongings in the pit, lit it on fire, and left Miller behind.

The coroner testified that the cause of Myers's death was mechanical asphyxiation.  The glove, the blunt force trauma, the way she was tied, and methamphetamine toxicity combined to make breathing difficult.

When firefighters responded to the fire, they found Miller.  His head and face were injured.  Miller asked for help and said five people were involved in murdering

3

Myers, including Wisto and York. Miller told a sheriff's deputy that he, York, Hill, and Greenwell beat Myers with a baseball bat at Wisto's home. He said he was ordered to put Myers in a pick-up truck and to collect fuel and a shovel. He said he carried Myers's body to a place where they dug the pit, he was hit with something, and he ran away. He said Wisto was involved and is a "fucking crazy bitch."

Later that morning, Hill and Greenwell were arrested in Wisto's truck. Officers arrested York in the evening at his girlfriend's house. They questioned him twice while in custody. York admitted that he participated in beating Myers, rode in the truck to Santa Margharita, and helped dig the pit for Myers's body. He minimized his involvement, saying he was afraid of Hill and Hill told him what to do.

While in jail, Wisto spoke to her cellmate about the crimes. York, who was also in jail, wrote notes to another inmate about the crimes. Both in-custody informants testified at trial, and the trial court admitted York's notes, as well as letters he wrote from jail to friends.

## DISCUSSION

*York's Motion to Suppress His Statements to Police (Miranda)*

York moved to suppress the two police interviews on the ground he did not voluntarily, knowingly and intelligently waive his *Miranda* rights. Both interviews were videotaped. At the initial interview, a detective read York his *Miranda* rights. York responded audibly that he understood his right to remain silent, his right to the presence of an attorney, his right to appointed counsel, and that anything he said may be used against him. (He responded: "Mm, hmm . . . Yep . . . Yes . . . Yes.") York then answered the detective's questions. At his second interview, the same detective reminded York of his *Miranda* rights, saying, "[N]ot last night, the night before, . . . I read you *Miranda* warnings. You remember those?" York did not audibly respond to the question. He proceeded to answer the detective's questions.

The trial court denied York's motion to suppress, finding "there certainly is an implied waiver and Mr. York clearly was making a voluntary statement on both days."

4

It based its decision on its review of the transcripts and York's criminal record, which showed five prior law enforcement contacts and bookings.

York contends the trial court should have excluded his police interviews because the prosecution did not establish that he voluntarily and knowingly relinquished his right to remain silent and his right to counsel. (*Miranda v. Arizona*, *supra*, 384 U.S. 436, 475.) The record supports the trial court's conclusion that York voluntarily and knowingly gave up his *Miranda* rights when he freely responded to questions, fully understanding his rights.

We accept the trial court's determination of disputed facts if supported by substantial evidence, and we independently decide whether the challenged statements were obtained in violation of *Miranda*. (*People v. Davis* (2009) 46 Cal.4th 539, 586.) The transcripts and videotapes of York's interviews provide substantial evidence to support the court's finding of an implied waiver, and the court's ruling was legally correct.

The prosecution has the burden of establishing by a preponderance of the evidence that a defendant knowingly and voluntarily waived his *Miranda* rights. (*People v. Whitson* (1998) 17 Cal.4th 229, 248.) An express waiver is not essential. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 387; *North Carolina v. Butler* (1979) 441 U.S. 369, 376-377.) On the other hand, waiver "will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." (*Miranda v. Arizona*, *supra*, 384 U.S. 436, 475.) A valid waiver may be implied only if York's statements were both voluntary (free from coercion or deception) and knowing (made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it). (*People v. Davis*, *supra*, 46 Cal.4th 539, 586.) In determining whether a waiver was voluntary and knowing, courts must consider the totality of circumstances, keeping in mind the particular background, experience and conduct of the accused. (*Id.* at pp. 585-586.) "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." (*Berghuis*, at pp. 388-389.)

5

York knowingly waived his rights. He affirmatively acknowledged that he understood each right as it was explained to him. He was young and was not a high school graduate, but he was familiar with law enforcement through five prior criminal contacts. After acknowledging his rights, he proceeded without hesitation or confusion. His answers were clear and responsive, demonstrating competent intelligence and understanding. (*People v. Whitson*, *supra*, 17 Cal.4th 229, 247-248 [defendant's decision to answer questions after indicating he understood his rights supported a finding of implied waiver]; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1270 [same].)

York's waiver was voluntary because it was free from coercion or deception. York contends he had not slept for several days when he was arrested, but he never expressed a desire to stop the interviews and did not request a break. There is no evidence that the detectives resorted to physical or psychological pressure, threatened him, or induced him with improper promises. He had a 37-hour break before the second interview, and continued to willingly cooperate.

York contends he may have been high on methamphetamine or going through withdrawals, but there is no direct evidence that he was impaired during the interviews. His responses and demeanor support an inference that his waiver was the product of a deliberate choice. We accept the trial court's resolution of disputed facts and inferences if supported by substantial evidence. (*People v. Kelly* (1990) 51 Cal.3d 931, 947.) York's contentions about suffering from attention deficit/hyperactivity disorder and manic depression are not reflected in the evidence available to the trial court when it made its determination, and our view would not change if those facts were established. We are confident that York knowingly relinquished his rights.

The detectives were not required to readvise York of his *Miranda* rights before the second interview because it was reasonably contemporaneous with his prior knowing and intelligent waiver in view of the totality of the circumstances. (*People v. Mickle* (1991) 54 Cal.3d 140, 170-171.) York was in continuous custody. The second interview was conducted in the same location by one of the same interrogators who reminded him of the prior advisement. York showed no reluctance to continue. In these

6

circumstances, the 37-hour interlude did not invalidate the waiver. (*Id.* at p. 171 [36-hour interlude without readvisement]; *People v. Williams* (2010) 49 Cal.4th 405, 434-435 [40-hour interlude without readvisement].) We are satisfied that York's waiver was the product of a free and deliberate choice rather than of intimidation, coercion, or deception. (*Moran v. Burbine* (1986) 475 U.S. 412, 421.)

*Wisto's Motion to Exclude York's Statements to Police*

*(Miranda and Aranda/Bruton)*

Wisto moved to exclude York's statements on the grounds they implicated her and she would be denied an opportunity to confront York through cross-examination if he refused to testify. (*Bruton*, *supra*, 391 U.S. 123; *Aranda*, *supra*, 63 Cal.2d 518.) The prosecutor offered edited subtitled copies of the videotapes in which it replaced Wisto's name with passive voice and the neutral pronouns "someone" or "they." For example, the subtitles read: "[Someone] was all, if you got second--thoughts about this tell me now"; and "[the response was] . . . I know but sometimes stuff . . . has to go this way." Over defense objection, the trial court accepted the proposed redactions and admitted the edited interviews, but instructed the jury to consider the interviews only against York.

Wisto contends the trial court violated her right to confront witnesses when it admitted York's interviews because York was unavailable for cross-examination and the statements implicated her, despite the redactions. (U.S. Const., 6th Amend.; *Crawford v. Washington* (2004) 541 U.S. 36; *Bruton*, *supra*, 391 U.S. 123, 126-137; *Aranda*, *supra*, 63 Cal.2d 518, 528.) We disagree because York's statements did not facially implicate Wisto.

A criminal defendant has a right, guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution, to confront witnesses against him. (*Crawford v. Washington*, *supra*, 541 U.S. 36, 54.) *Crawford* does not apply because the prosecution did not offer York's interviews against Wisto, assuming the jury followed the trial court's limiting instruction.

We next consider whether the jury could reasonably be expected to follow the limiting instruction. (*Bruton*, *supra*, 391 U.S. 123; *Aranda*, *supra*, 63 Cal.2d 518.) When two defendants are jointly tried and the jury is instructed to consider the testimony

7

of a witness against only one of the defendants, the witness is not generally considered to be a witness "against" the other defendant within the meaning of the confrontation clause. (*Richardson v. Marsh* (1987) 481 U.S. 200, 206.) But a narrow exception applies when the statement of a nontestifying codefendant facially incriminates another defendant in a joint trial. (*Id*. at p. 207.) In that circumstance, the court cannot reasonably expect the jury to obey the instruction to disregard the evidence. (*Ibid.*; *Bruton*, at pp. 127–128, 135–137.) This narrow exception does "not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1176.) If the statement is incriminating only when linked to other evidence, the jury is more likely to obey the instruction to disregard it. (*Id.* at p. 1177.)

York's unedited statements implicated Wisto and York did not testify. In these circumstances, a trial court must determine whether the statement can be edited to remove parts that implicate the nondeclarant without prejudice to the declarant. If effective editing is possible, the court may admit the redacted statement and permit joint trial. If it is not possible, the court must either exclude the statement or sever the trial. (*Aranda*, *supra*, 63 Cal.2d 518, 531.)

The sufficiency of editing is determined on a case-by-case basis in light of the statement as a whole and other evidence that has been, or is expected to be, presented at trial. (*People v. Fletcher* (1996) 13 Cal.4th 451, 456, 468.) "[R]edaction that replaces the nondeclarant's name with a pronoun or similar neutral and nonidentifying term will adequately safeguard the nondeclarant's confrontation rights unless the average juror, viewing the confession in light of the other evidence introduced at trial, could not avoid drawing the inference that the nondeclarant is the person so designated in the confession and the confession is 'powerfully incriminating' on the issue of the nondeclarant's guilt." (*Id.* at p. 467.)

For example, in *People v. Burney* (2009) 47 Cal.4th 203, 231, editing was insufficient where the evidence led to an obvious inference that the nondeclarant defendant was "the other" who shot the victim. On the other hand, "a confession that is redacted to

8

substitute pronouns or similar neutral and nonidentifying terms for the name of a codefendant will be sufficient if the codefendant was just one of a large group of individuals any one of whom could equally well have been the coparticipant mentioned in the confession." (*People v. Fletcher*, *supra*, 13 Cal.4th 451, 466.) "[T]he jurors' ability to obey the instructions depends upon how directly and how forcefully the codefendant's confession incriminates the nondeclarant defendant." (*Id.* at p. 465.)

The prosecutor effectively edited York's statements so they did not "directly" or "forcefully" implicate Wisto. York's incriminating statements could have been referring to any one of the coparticipants. For example, in the edited video, York says that after dinner Hill went into the bedroom with Myers and "someone" came out and said that Myers was "getting [a shot] in her leg from [Hill]." "Someone" could have been anyone in the group but Hill. York said he saw the group beating Myers in his bedroom, and he went into the other room and said he was scared. He "was told" that "everything's gonna be alright," and he "was gonna be okay." York asked, "Why does this gotta happen?" and someone said, "[Myers is] disrespectful and she needs to learn a lesson." Wisto points out that she was the only participant who did not go into York's bedroom during the beating. But the jury could not tell whether York had this conversation with someone who had been in the bedroom during the beating. "Someone" could have left that room with him.

York said that before Myers was "duct taped," he asked Hill why they could not just drop Myers off in Santa Maria. Hill said he could not because "someone" told him to "beat her up and take her and kill her" and "get rid of her." Hill said that "[someone] doesn't want . . . her around here anymore," and that Myers "is gonna get tied up and duct taped" because "she's been too disrespectful." York said Myers was disrespectful and that Hill was very concerned about respect. Hill said, "[Someone] wanted this done." These references could have been to anyone and do not implicate Wisto unless they are linked to other evidence such as her own statements to her cellmate.

York said he was not told anything "[e]xcept for--[someone] said this needs to be done. [Someone] wants it done." York said that when "someone" tells him to "take care of this problem," he usually takes care of it by just telling the person they need to go

9

or that they need to be respectful. York could have been referring to Hill, whose instructions York said he followed.

York said he asked "someone," "Why does this have to be done like this?" when Miller and Greenwell were carrying Myers to the truck and Hill was telling them to hurry. The person said, "[Hill] knows what's going on. And that's all I'm gonna say." York said he did not want to go, and the person said, "[Hill] wants you to go, so go with him." York thought that "someone" had talked to Hill "about what was going on before." York said that he told someone, "I don't feel like going," and they said, "Then don't go," and "you don't have to." They said, "[I]f you have any problems with this, . . . [j]ust tell me." When York said, "I don't have a problem but this is - not right," the response was, "I know but sometimes stuff have to ha - has to go this way." York could have been having this conversation with any coparticipant other than Hill.

This case is unlike *People v. Fletcher*, *supra*, 13 Cal.4th 451, 457, in which jurors "could not help but" infer that the codefendant was the "friend" with whom the declarant confessed he was robbing people. In *Fletcher*, there were only two participants: the declarant and the nondeclarant. (*Id.* at pp. 457, 470-471.) This case is also unlike *People v. Archer* (2000) 82 Cal.App.4th 1380, 1390, in which a redacted statement made it obvious there was one other participant in the murder. The statement supplied the person's address and license plate number. Here, the number of participants and the ambiguity of York's edited references made it likely that the jurors would be able to follow the court's instruction to disregard York's statements in determining Wisto's guilt.

Wisto also argues that York's statements were inadmissible under state evidentiary rules as declarations against penal interest because they minimized York's culpability. (*People v. Duarte* (2000) 24 Cal.4th 603, 613.) She contends the trial court was required to parse and exclude the self-serving portions. (*Williamson v. United States* (1994) 512 U.S. 594, 604; *People v. Davis* (2005) 36 Cal.4th 510, 535.) Wisto forfeited this objection when she did not raise it in the trial court. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) And the court did not err because the evidence was not admitted against Wisto.

10

*Corroboration of Accomplice and In-Custody Informant Statements*

Wisto contends there is insufficient evidence to corroborate the statements of accomplices York, Miller, and Greenwell (§ 1111)[2] or the statements of two in-custody informants (§ 1111.5). She contends that accomplices and in-custody informants may not supply cross-corroboration because both are highly unreliable. We disagree. Even if we agreed, we would affirm because each witness's testimony is also corroborated by independent evidence.

The testimony of an accomplice must be corroborated. (§ 1111; *People v. Tobias* (2001) 25 Cal.4th 327, 331.) Another accomplice may not supply the corroboration. (*People v. Davis*, *supra*, 36 Cal.4th 510, 543.) The plain language of section 1111 is unambiguous; it does not preclude use of in-custody informant testimony to corroborate accomplice testimony. The more recent statute, section 1111.5, speaks to in-custody informant testimony, but does not impose such a limitation: "Nothing in this section limits or changes the requirements for corroboration of accomplice testimony pursuant to Section 1111." (§ 1111.5, subd. (b).)

Section 1111.5 provides that, like the testimony of an accomplice, the testimony of an in-custody informant must be corroborated. The corroboration "shall not be provided by the testimony of another in-custody informant" unless they are unlikely to have communicated with each other on the subject of the testimony. (*Id.*, subd. (a).) An "in-custody informant" is not an accomplice. "[An] 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or

---

[2] Section 1111 states, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

correctional institution."  (§ 1111.5, subd. (b).)  Thus, the statute does not preclude use of accomplice testimony to corroborate an in-custody informant's testimony.

The corroborating evidence may be slight, but it must connect the defendant with the commission of the offense without aid of the witness's testimony.  (§§ 1111, 1111.5; *People v. Davis*, *supra*, 36 Cal.4th 510, 543; *People v. Bowley* (1963) 59 Cal.2d 855, 861-862.)  The corroboration is not sufficient if it merely shows the commission of the offense or its circumstances.  (§§ 1111, 1111.5.)  It need not by itself prove the defendant is guilty and it does not need to support every fact mentioned by the accomplice or in-custody informant.  (*Davis*, at p. 543.)  Mere evidence of presence or knowledge is insufficient.  (*People v. Boyd* (1990) 222 Cal.App.3d 541, 557, fn. 14; *In re Michael T.* (1978) 84 Cal.App.3d 907, 911.)  The defendant's admissions may provide the necessary corroboration.  (*People v. Williams* (1997) 16 Cal.4th 635, 680.)

The statements of accomplices Wisto, York, Miller, and Greenwell and the in-custody informants corroborate each other in many details that link York and Wisto to the crimes.  Wisto's statements to her cellmate and York's letters to another inmate are damning.  But sufficient independent evidence also corroborates both classes of witnesses.

Independent witnesses placed Wisto at the trailer just before and after the men tortured Myers and carried her away in the truck.  Greenwell's testimony that Wisto gathered a list of supplies for the killing is corroborated by a list found in a trash can near Wisto's garage.  The listed supplies were found in Wisto's truck smeared with Myers's blood, around Wisto's home, and in the pit with Myers's burnt body.  Miller's testimony that he was ordered to collect fuel and a shovel is corroborated by the same evidence.

Greenwell's testimony that Wisto warned them during the beating that someone was at the door is corroborated by a neighbor who testified she knocked at the door and no one answered.  Greenwell's testimony that Wisto gave the participants a "walkie-talkie" before they left is corroborated.  Hill tried to use a walkie-talkie to contact Wisto after his arrest.  And investigators found another walkie-talkie at Wisto's home.

Greenwell's and Miller's testimony about the beating is corroborated by Myers's injuries, duct tape found on York's bed and Myers's body, a bloody bat found in

12

Wisto's garage, and the combined DNA of Myers and York near a hole in the bedroom's drywall.

Greenwell's and Miller's testimony about the killing is corroborated. The coroner found a glove protruding from Myers's mouth. Miller's testimony that York and Hill hit him with a bat and shovel is corroborated by his injuries and by jailhouse correspondence between Wisto and York referring to Miller as "shovel face." Greenwell's testimony that he, York, and Hill went to Jack-in-the-Box for tacos after they killed Myers is corroborated by surveillance footage and a shirt with York's DNA found in the restaurant's dumpster.

Greenwell's testimony that Wisto was angry with Myers for stealing things and carving into Wisto's desk is corroborated by graffiti that investigators found carved into Wisto's desk. The carving also corroborates the cellmate's testimony about Wisto's reasons for wanting something "bad" to happen to Myers. York's notes to an inmate corroborate the inmate's testimony about them. The testimony of each accomplice or in-custody witness is corroborated by sufficient evidence connecting York and Wisto to the crimes.

*Special Circumstance - Kidnap-Murder (York)*

York contends the kidnap was carried out solely for the purposes of disposing the body and concealing the murder and therefore cannot support the special circumstance finding of kidnap-murder. (*People v. Green* (1980) 27 Cal.3d 1, 61-62, overruled on other grounds by *People v. Morgan* (2007) 42 Cal.4th 593, 611.) We reject the contention because substantial evidence in the record supports the jury's finding that York intended to kidnap Myers and did not act solely to facilitate the murder, even assuming an independent purpose requirement survived legislative amendments in 2000.

The felony-murder special circumstance increases the punishment for murders committed while "defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" certain enumerated felonies, including kidnapping. (§ 190.2, subd. (a)(17)(B).) Until at least 2000, proof of an "independent purpose for the commission of

13

the felony" was required.  (*People v. Mendoza* (2000) 24 Cal.4th 130, 182; 190.2, subd. (a)(17).)  In 2000, an initiative revised the statute to eliminate the independent purpose requirement.  We need not decide whether the requirement must survive to render the statute constitutional because York's jury was instructed on the requirement and the record supports its determination that the requirement was satisfied.  (CALCRIM No. 730.)

Substantial evidence supports a finding that York intended to kidnap Myers and did not act solely to facilitate the murder.  A reasonable jury could infer that, when York and his companions tied up Myers, put her in a canvas bag, and drove her around in the bed of a truck while she was still conscious, they intended to terrify and punish her for her disrespectful behavior.  (*People v. Brents* (2012) 53 Cal.4th 599, 610.)  That the kidnapping was also part of a plan carried out with intent to kill is not dispositive. "Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance."  (*People v. Mendoza*, *supra*, 24 Cal.4th 130, 183; *People v. Clark* (1990) 50 Cal.3d 583, 608–609.)  This case is unlike *Ario v. Superior Court* (1981) 124 Cal.App.3d 285, 287, 289-290, in which a defendant drove his victims to the execution site after he announced he would kill them.  In that case, there was no evidence to suggest defendant did so for any purpose other than to facilitate their murder.

Legislative amendment in 2000 eliminated the "independent purpose" requirement for the special circumstance of kidnapping.  (§ 190.2, subd. (a)(17)(M), Prop. 18, Primary Elec. (Mar. 7, 2000) [no proof of independent purpose required for kidnap-murder and arson-murder special circumstance].)  But York contends the narrowing construction survives through constitutional necessity, citing *Green* and its progeny. *Green* read the independent purpose requirement into the felony-murder special circumstances to provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not.  (*People v. Green*, *supra*, 27 Cal.3d 1, 61-62; see *Furman v. Georgia* (1972) 408 U.S. 238, *Gregg v. Georgia* (1976) 428 U.S. 153 [imposition of death penalty without rational basis would constitute cruel and unusual punishment].)  On this record the issue is academic and we do not decide it.

14

*Special Circumstance - Torture Murder (York & Wisto)*

York and Wisto contend the torture was carried out solely for the purpose of rendering Myers immobile and unconscious to facilitate the murder. Therefore, the special circumstance finding of torture-murder cannot be supported. We disagree.

The torture-murder special circumstance requires proof that the murder was intentional and the defendant personally intended to torture the victim. (§ 190.2, subd. (a)(18); *People v. Wilson* (2008) 44 Cal.4th 758, 804.) The jury was so instructed. Substantial evidence supports the requisite findings that Wisto and York intended to kill Myers and also intended to inflict extreme physical pain and suffering on her, while she was still alive, for a sadistic reason such as revenge, extortion, or persuasion. (§ 190.2, subd. (a)(18); *People v. Elliot* (2005) 37 Cal.4th 453, 479; see CALCRIM No. 733.)

York demonstrated intent to torture Myers when he struck her legs with a baseball bat and stomped on her. The jury could reasonably infer his purpose was to inflict extreme and prolonged pain for a sadistic purpose, and not solely to facilitate the murder by disabling her. Myers was already bound and drugged when York beat her legs, kicked her and stomped on her. Greenwell said York struck her knees and shins. These blows were neither likely to kill nor render her unconscious, notwithstanding the prosecutor's argument that each act of torture contributed to her death.

This case is unlike *People v. Mungia* (2008) 44 Cal.4th 1101, 1136, in which a torture-murder special circumstance was vacated for lack of independent intent to torture. In *Mungia*, the defendant killed the victim with blows to her head while she was bound. "The killing was brutal and savage, but there is nothing in the nature of the injuries to suggest that defendant inflicted any of them in an attempt to torture Franklin rather than to kill her." (*Id*. at p. 1137.) There was "no evidence that defendant deliberately inflicted nonfatal wounds to the victim in an attempt to increase her suffering," or that the defendant was angry with her or had any motive to inflict pain in addition to the pain of death. (*Id*. at p. 1138.) In contrast, the evidence of York's sadistic intent is strong.

There is also substantial evidence of Wisto's sadistic intent. Wisto was motivated to inflict pain on Myers. She told her cellmate that Myers was a drug addict or

15

prostitute who had disrespected her by stealing from her and carving initials in her desk. She said Myers was out of control and deserved bad things to happen to her. Greenwell testified that, just before the men tortured Myers, Wisto told York "sometimes things just have to happen." Wisto acted as a lookout during the torture, warning them someone was at the front door. A jury could infer she intended to facilitate the torture.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.

16

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant Frank Jacob York.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant Rhonda Maye Wisto.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Chung L. Mar, Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

17